

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-16-2005

# USA v. Dobson

Precedential or Non-Precedential: Precedential

Docket No. 04-2169

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"USA v. Dobson" (2005). *2005 Decisions.* Paper 602.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/602

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 04-2169

———


UNITED STATES OF AMERICA

v.

MARSHA DOBSON,
Appellant


———


On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 02-cr-00616-7)
District Judge: Honorable Michael M. Baylson

———


Argued May 11, 2005

Before: SLOVITER, FISHER, and ALDISERT Circuit Judges.

(Filed   August 16, 2005)


———


Sandra A. Gafni, Esq. (Argued)
Suite 433
1819 John F. Kennedy Boulevard
Philadelphia, PA l9l03

    Attorney for Appellant

Anita D. Eve, Esq.  (Argued)
Office of United States Attorney

Suite 1250
615 Chestnut Street
Philadelphia, PA 19106

Attorney for Appellee

———

OPINION OF THE COURT

———

SLOVITER, Circuit Judge.

We have before us the appeal of Marsha Dobson who was convicted by a jury of three counts of mail fraud under 18 U.S.C. § 1341. Dobson argues, inter alia, that she is entitled to a new trial because the District Court failed to properly charge the jury with regard to the "culpable participation" component of the alleged fraudulent scheme.[1]

## I.

On September 25, 2002, a federal grand jury returned a ninety-nine count Indictment charging Marsha Dobson and nine other individuals--including Dobson's husband, Larry Dobson--with various counts of conspiracy, mail fraud, and money laundering. Dobson was charged in that Indictment with one count of conspiracy to commit mail fraud, three counts of substantive mail fraud, and three counts of aiding and abetting mail fraud.

Prior to trial, three of Dobson's co-defendants entered guilty pleas. In addition, the District Court severed Larry Dobson's case from that of his wife and the other defendants in order to avoid forcing him to choose "between the right to testify in one's own defense and the right not to testify adversely against a spouse. . . ." United States v. Dobson, No. Crim. 02-

---

[1] The District Court had jurisdiction pursuant to 18 U.S.C. § 3231; this court has jurisdiction under 28 U.S.C. § 1291.

2

616-06, 2003 WL 22427984, at *2 (E.D. Pa. Aug. 18, 2003). Dobson and her five remaining co-defendants--Thomas Massara, Dawnell Griffith, Kimberli Lange, Karen Beam, and Alan Schall--proceeded to jury trial on September 9, 2003.

The evidence presented at trial, viewed in the light most favorable to the United States as the verdict winner, showed the following: Dobson had been a salesperson for Surplus Agents of America ("SAA"), which held itself out as being engaged in the business of locating and reselling surplus and liquidated merchandise, such as clothing, toiletries, and household items, from brand-name manufacturers who were unable to sell such goods through the regular channels of distribution. SAA located individuals who paid a fee to become a SAA "broker" on SAA's representation that, as brokers, they would be able to purchase discounted brand-name merchandise and resell it to third parties at a substantial profit.

After SAA ceased to exist in December 1994, William Kenneth Garrett, one of its principal managers, moved the operation to Fort Washington, Pennsylvania and established a similar business under the name Universal Liquidators ("UL"). At trial, Garrett, who had previously entered a plea of guilty, testified that due to the similarity between the UL and SAA operations, he had hired many of SAA's former employees, including Dobson, to work at UL.

As a UL salesperson, Dobson attended trade shows around the country where she marketed UL broker positions. In her sales presentations, Dobson told potential brokers that they could buy into UL's brokerage opportunity for a one-time payment of approximately $5,000.00. In return, the brokers were promised training, the materials they would need to start their business, and lists of manufacturers and distributors who would allegedly sell them the brand-name merchandise at prices substantially below market value which they could resell to the public at a profit.

Dobson used UL brochures and written materials in presenting her sales pitch about the company. Among other things, these UL materials represented that UL had relationships

3

with various manufacturers who would supply brand-named merchandise to UL brokers at deep discounts. In fact, as Garrett himself testified at trial, UL had no relationships with any of the brand-name manufacturers as claimed in its sales materials. He also admitted that, contrary to its brochures and written materials, UL did not actually have any mechanisms or methods whereby it could obtain for its brokers the deeply discounted brand-name merchandise.[2]

The trial evidence also showed that, in marketing the UL "opportunity" to prospective brokers, Dobson was not always truthful about the scope of her involvement with UL. Most pertinently, Dobson did not tell potential brokers that she was an employee of UL whose job it was to sell broker positions; instead, she told them that she herself was a broker.[3] Indeed, according to the testimony of one trade-show attendee, Dobson held herself out as a very successful UL broker who, among other things, had made enough money to buy "a horse ranch in Montana." App. at 170. Dobson further regaled prospective brokers with stories, examples, and details regarding the deals that she had supposedly negotiated for sizeable profits. None of this was true.

In addition to the falsehoods and misstatements made by Dobson, she used the false and fraudulent UL brochures and written materials in her presentation. Throughout the trial, Dobson vigorously denied both that she knew these materials to be untrue and that she knew of the overall fraudulent nature of UL's business plan.

---

[2]Garrett also testified that he paid people, whom he called "singers," App. at 317, to serve as false references: potential brokers would call these individuals who would pose as successful brokers and give favorable reports of their experience with UL in an attempt to persuade the potential brokers to remit payment and join UL.

[3]Garrett testified that Dobson received a commission of 25% on her sales of brokerages.

The strongest evidence in the record that Dobson knew that UL and SAA were completely fraudulent operations was provided by Carol Brothers. Brothers testified that she had worked for SAA, first as a salesperson and later in SAA's offices. She testified that she quit SAA and reported its activities to federal law enforcement authorities when SAA's management "promoted me, moved me into the office and I realized everything that I was saying in the field, all of us were saying in the field[,] was not factual." App. at 279. Brothers further testified that after she had left SAA, she happened to encounter Dobson at a trade show and took the opportunity to tell Dobson that SAA was a scam and that what she was "saying in the field was a lie." App. at 283. To discredit Brothers' testimony, Dobson's attorneys brought out evidence during cross-examination suggesting that Brothers believed SAA owed her over $100,000.00 in back commissions, that she had left the organization on poor terms, and that only after she left did she report SAA to the authorities.

At the close of the prosecution's case, the District Court granted motions for judgment of acquittal under Fed. R. Crim. P. 29 on all counts pending against Griffith, Lange, Beam, and Schall. It further entered judgments of acquittal on the conspiracy counts pending against Massara and Dobson. In sum, after the Fed. R. Crim. P. 29 stage, the only charges that remained for the jury's resolution were the substantive mail fraud counts pending against Massara and Dobson.

Following the defense cases, jury instructions, and deliberations, the jury convicted both Massara and Dobson. Specifically as to Dobson, the jury convicted her of the three mail fraud counts charged in Counts Twenty-Eight through Thirty of the Indictment. Following this verdict, the District Court granted Dobson's request for the appointment of new counsel.

Dobson's new counsel filed post-verdict motions for acquittal, see Fed. R. Crim. P. 29(c), and new trial, see Fed. R. Crim. P. 33, both of which the District Court denied following oral argument. On June 18, 2004, the District Court sentenced

5

Dobson to three concurrent terms of twenty-four months incarceration to be followed by three years of supervised release. The District Court further ordered Dobson to pay restitution.

Dobson filed this timely appeal in which she challenges the District Court's jury instruction on the elements of mail fraud and the sufficiency of the evidence presented by the United States to support the guilty verdict on Count Thirty. Dobson further seeks review of her sentence in light of Blakely v. Washington, 542 U.S. 296 (2004), a decision that the Supreme Court of the United States returned less than a week after her sentencing.[4]

**II.**

Dobson argues that the District Court erroneously instructed the jury on the substantive elements of the crime of mail fraud.[5] Specifically, she argues that the District Court's

---

[4]The parties filed their appellate briefs before the Supreme Court announced its decision in United States v. Booker, 543 U.S. ___, 125 S. Ct. 738 (2005), extending the Blakely holding to the United States Sentencing Guidelines.

[5] In pertinent part, the mail fraud statute reads:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing . . . shall be fined under this title or imprisoned not more than 20 years, or both.

6

instruction failed to include the "culpable participation" requirement for mail fraud as enunciated in this court's decisional law.

Although "[w]e generally review jury instructions for abuse of discretion," see Walden v. Georgia-Pacific Corp., 126 F.3d 506, 513 (3d Cir. 1997), our review "is plenary when the question is whether a district court's instructions misstated the law." United States v. McLaughlin, 386 F.3d 547, 552 (3d Cir. 2004). There is some record evidence that Dobson's trial counsel brought the issue of culpable participation to the attention of the District Court, but Dobson concedes that trial counsel did not properly preserve the issue and that, as a result, this court's review is limited to plain error. See Fed. R. Crim. P. 52(b). But see United States v. Russell, 134 F.3d 171, 178-79 (3d Cir. 1998).

Under the plain error standard, before an appellate court can correct an error not raised at trial, it must find: (1) an error; (2) that is plain; and (3) that affected substantial rights. United States v. Olano, 507 U.S. 725, 733-35 (1993); United States v. Davis, 407 F.3d 162, 164 (3d Cir. 2005) (en banc); United States v. Syme, 276 F.3d 131, 143 n.4 (3d Cir. 2002). If all three conditions are met, an appellate court may in its discretion grant relief, but only if "'the error seriously affects the fairness, integrity, or public reputation of [the] judicial proceedings.'" United States v. Haywood, 363 F.3d 200, 206-07 (3d Cir. 2004) (quoting Johnson v. United States, 520 U.S. 461, 467 (1997)).

Under the requisite Fed. R. Crim. P. 52(b) analysis, we must first determine whether the District Court's instruction on the elements of mail fraud constituted legal error--a necessary predicate of plain error. The substantive elements of mail fraud under 18 U.S.C. § 1341 are: (1) the existence of a scheme to defraud; (2) the use of the mails--whether the United States Postal Service or a private carrier--in furtherance of the fraudulent scheme; and (3) culpable participation by the

---

18 U.S.C. § 1341.

7

defendant, that is, participation by the defendant with specific intent to defraud. United States v. Copple, 24 F.3d 535, 544 (3d Cir. 1994); United States v. Pearlstein, 576 F.2d 531, 534 (3d Cir. 1978). The District Court charged the jury as follows:

> Now, what are the essential elements of the charge of mail fraud.
>
> They are as follows:
>
> You must find that the Government has proved each one of these elements beyond a reasonable doubt . . . .
>
> One, the defendant knowingly devised or participated in a scheme to defraud, or to obtain money or property by materially false or fraudulent[] pretenses, misrepresentations, or promises.
>
> Two, the defendant acted with specific intent to defraud;
>
> And, three, in advancing, furthering, or carrying out the scheme, the defendant used the mails or [a] private or commercial interstate carrier, or caused the mails for private or commercial interstate carrier to be used.

App. at 472.

Dobson argues that this instruction failed to articulate the "culpable participation" requirement needed to support a mail fraud conviction. In so arguing, she relies heavily on our decision in United States v. Pearlstein, 576 F.2d 531 (3d Cir. 1978).

8

In Pearlstein, we held that in a mail fraud case it is not sufficient for the United States to prove merely that a defendant participated in a fraudulent scheme; rather, it must show that the defendant did so knowingly and "in furtherance of the illicit enterprise." Id. at 545; see also Genty v. Resolution Trust Corp., 937 F.2d 899, 908-09 (3d Cir. 1991) ("When . . . liability is premised on violations of the federal mail fraud statute, 18 U.S.C. § 1341, the defendants must have knowledge of the illicit objectives of the fraudulent scheme and willfully intend that those larger objectives be achieved."). Unwitting participation in a fraudulent scheme is not criminal under § 1341. Moreover, the relevant inquiry is not whether the defendant acted knowingly in making any misstatement, but whether she did so with respect to the overarching fraudulent scheme--that is, the particular "illicit enterprise" charged in the indictment. 576 F.2d at 537.[6] As we stated in Pearlstein:

> At one time or another, all the defendants
> exaggerated their role in the . . . operation and
> made false statements concerning their own
> business backgrounds. However, such

---

[6] Although it was presented in a different posture, Pearlstein involved a mail fraud issue strikingly similar to the one presently at bar. The defendants in Pearlstein were salespeople for G. Martin Frank, Ltd. ("GMF"), a fraudulently conceived business entity that sold worthless pen distributorships. Pearlstein, 576 F.2d at 537-38. GMF hired the defendants to sell the distributorships to unsuspecting customers, but the defendants contended that they did not know that they were actually effecting a dupe on their employer's behalf. Id. at 545. However, the defendants had, at various times and in various ways, crossed the line from mere puffery to outright deception. Id. at 544-45. The prosecution marshaled much evidence of the defendants' misrepresentations to potential distributors, but none that would have allowed a jury to conclude that the defendants knew that the overarching GMF enterprise was a fraud. Id. at 545. Accordingly, we reversed their convictions for want of sufficient evidence of "their knowing participation in the overall fraudulent scheme." Id. at 545-46.

9

misrepresentations did not relate to the essential feature of their presentations[,]the sale of . . . [the bogus] distributorships[,]and can hardly be construed as fraudulent.

576 F.2d at 544. Thus, the controlling question is whether the District Court's jury instruction required a determination of whether Dobson knowingly participated in UL's broader scheme to defraud.

The charge did not convey this essential aspect of the knowledge element of the fraud charged in the Indictment. The District Court's instruction nowhere advised the jury that it could convict only on finding that Dobson in fact knew of UL's fraudulent scheme. It directed the jury to determine "whether the defendant knowingly devised or participated in a scheme to defraud." App. at 472. This could have referred either to culpable participation in UL's fraudulent scheme (i.e., the selling of brokerages that she knew to be worthless) or to Dobson's questionable sales tactics (e.g., her claim that the UL opportunity allowed her to buy "a horse ranch in Montana"). Stated otherwise, the language of the charge easily, but erroneously, encompassed the possibility that Dobson's own misrepresentations, without knowledge of UL's broader illicit purpose, could constitute her creation of, or participation "in a scheme to defraud, or to obtain money or property by materially false or fraudulent[] pretenses, misrepresentations, or promises," App. at 472, and hence guilt under 18 U.S.C. § 1341 as charged in the Indictment.

As in Pearlstein, this case presents two layers of potential fraud or misrepresentation that do not necessarily interconnect: (1) Dobson's dubious sales presentations; and (2) the fraudulent UL scheme charged in the Indictment. Pearlstein is clear in teaching that proof of Dobson's participation in the latter is necessary to the prosecution's case and that proof of the former is only relevant to the extent it may constitute circumstantial evidence of the latter. See Pearlstein, 576 F.2d at 544. The District Court's instruction failed to make the necessary legal distinction between the two and thus entirely omitted the

prosecution's obligation to show that Dobson knowingly devised or participated in the broader UL scheme as charged in the Indictment.[7]

The United States raises several arguments in an attempt to show that the District Court's charge was not in error. First, the United States points to this court's formulation of the elements of mail fraud in two post-Pearlstein cases, United States v. Pharis, 298 F.3d 228 (3d Cir. 2002) (en banc), and United States v. Hannigan, 27 F.3d 890 (3d Cir. 1994), and argues that this Court has retreated from the culpable participation requirement of Pearlstein.

It is true that in Pharis we did not explicitly articulate a culpable participation requirement but there was no need to do so in that case. There was only one "layer" of potentially misleading or fraudulent activity to be concerned with--that of the overarching scheme. Indeed, the prosecution's theory in Pharis was that the defendants themselves directly devised the fraudulent scheme at issue. Pharis, 298 F.3d at 230-31. Furthermore, contrary to the United States' interpretation of Hannigan, we did impose a culpable participation requirement in that case. Specifically, we noted that the prosecution in a mail fraud case must establish "the participation by the defendant in the particular scheme charged with the specific intent to defraud." Hannigan, 27 F.3d at 892.[8] The United States'

_____

[7] Brothers' testimony (albeit impeached to some effect on cross-examination) that she told Dobson about the fraudulent nature of the SAA scheme provided evidence from which the jury could have found that Dobson knew of, and nonetheless continued to participate in, the overall fraudulent scheme. There is also evidence to show that Dobson engaged in her own dishonesty simply for the purpose of increasing her sales. Under the District Court's instructions, the jury could have erroneously viewed Dobson's individual malfeasance to be sufficient to support the 18 U.S.C. § 1341 charges levied in the Indictment.

[8] Moreover, subsequent to Pearlstein we have made other more explicit references to the culpable participation requirement.

11

characterization of our decisional law, therefore, is not persuasive.

Next, the United States reminds us that we must consider the jury instructions as a whole and argues that the District Court's instructions respecting the meaning of a scheme to defraud and intent to defraud required the jury to make a finding of culpable participation in order to return a guilty verdict. We agree that "a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." Cupp v. Naughten, 414 U.S. 141, 146-47 (1973). The District Court's definition of a scheme to defraud stated that such a scheme must involve "a departure from fundamental honesty, moral uprightedness, or fair play and candid dealings in the general light of the community," and that it excludes mere puffery. App. at 472. This instruction, correct as given, see Pearlstein, 576 F.2d at 544, did not mention the need for culpable participation in the charged UL scheme; indeed, without any instruction on culpable participation, this instruction actually increased the likelihood of the jury convicting on the basis of Dobson's misleading sales practices because her practices could easily be viewed as falling within that description. Similarly, the instruction on the meaning of intent to defraud, again correct as far as it went, failed to inform the jury that a guilty conviction required culpable participation. Cf. Arthur Anderson, LLP v. United States, __ U.S.__, __, 125 S. Ct. 2129, 2136 (2005). Thus, even when we consider the instructions holistically, Cupp, 414 U.S. at 147, the District Court's instructions failed to include the necessary element of culpable participation.

In sum, we conclude that the District Court's instruction was in error. We must nonetheless determine whether this error

---

For instance, in Genty v. Resolution Trust Corp., 937 F.2d 899 (3d Cir. 1991), we cited Pearlstein for the proposition that "defendants must have knowledge of the illicit objectives of the fraudulent scheme and willfully intend that those larger objectives be achieved." 937 F.3d at 908-09 (emphasis added).

12

was "plain." Haywood, 363 F.3d at 207; Syme, 276 F.3d at 143 n.4.

In order to be "plain" an error must be "clear" or "obvious." Olano, 507 U.S. at 731. Here, we have no difficulty in concluding the District Court's error was plain: Pearlstein was on the books well before the inception of the trial, our subsequent decisional law demonstrates its continued validity in this Circuit, and its applicability to the case at hand is obvious. See generally Johnson v. United States, 520 U.S. 461, 468 (1997).

Because the error was plain, we must next decide whether it affected Dobson's substantial rights. Fed. R. Crim. P. 52(b); see also Olano, 507 U.S. at 734. In order to "affec[t] substantial rights," an error must have been prejudicial. Olano, 507 U.S. at 734. In undertaking this prejudice analysis in the context of an erroneous jury instruction, we must determine whether Dobson has carried her burden to show that there is a "reasonable likelihood" that the jury prejudiced her by applying the challenged instruction in an impermissible manner. Gov't of V.I. v. Rosa, 399 F.3d 283, 295 (3d Cir. 2005); see also Haywood, 363 F.3d at 207 ("[T]he relevant inquiry . . . is whether, in light of the evidence presented at trial, the failure to instruct had a prejudicial impact on the jury's deliberations.") (internal citation and quotations omitted); United States v. Xavier, 2 F.3d 1281, 1287 (3d Cir. 1993).

It is settled that due process requires the prosecution to prove beyond a reasonable doubt every fact necessary to establish the offense as charged against the defendant. In re Winship, 397 U.S. 358, 364 (1970); Haywood, 363 F.3d at 207. Indeed, consistent with In re Winship and its progeny, we have noted that, although it is not a per se rule, "'the omission of an essential element of an offense [in a jury instruction] ordinarily constitutes plain error.'" Haywood, 363 F.3d at 207 (quoting Xavier, 2 F.3d at 1287.

As propounded by the District Court, however, the instructions at issue made it possible for the jury to have convicted Dobson without finding beyond a reasonable doubt

13

that she culpably participated in the UL scheme. To be sure, the Government presented evidence from which the jury could have concluded that Dobson knew of the fraudulent nature of the UL scheme. However, this does not preclude a finding of prejudice for purposes of plain error. See Xavier, 2 F.3d at 1287 ("Although the government presented evidence from which a jury could have inferred defendant's knowledge . . . the relevant inquiry in this case is whether, in light of the evidence presented at trial, the failure to instruct had a prejudicial impact on the jury's deliberations.") (internal citation, quotations, and alterations omitted).

We conclude that the error trenched on Dobson's substantial rights because there is a "reasonable likelihood" that the jury applied it in a manner that resulted in an unconstitutional conviction. See Rosa, 399 F.3d at 295; cf. Davis, 407 F.3d at 164 ("[A]n error will affect substantial rights where it is prejudicial and affected the outcome of the district court proceedings.") (internal citation and quotations omitted).[9]

_____

[9] This case, therefore, is unlike our recent decision in Rosa where we determined that the trial court's jury instruction, although amounting to plain error, did not have a deleterious effect upon the defendant's substantial rights. 399 F.3d at 297. In Rosa, the trial court instructed the jury that it could convict the defendant of first-degree murder if it found that he acted with "'an intent to kill or inflict serious bodily harm against a human being.'" Id. at 287 (quoting jury instruction, emphasis added). The latter half of this formulation of first-degree murder was plainly erroneous. However, because the trial court's other instructions (in particular, its instruction on premeditation), correctly imposed a "specific intent to kill" requirement, we concluded that the trial court's plainly erroneous first-degree murder instruction did not prejudice the defendant. Id. at 296. Moreover, "[t]he jury's differential treatment of the two defendants" charged in that joint trial convinced us that the jury was cognizant of the fact "that the government had the burden to prove that a defendant had the intent to kill if it was to convict him of first-degree murder." Id. As discussed above with respect to the instant case, however, neither

14

Of course, even when an error is plain and injurious to substantial rights, we should nonetheless decline to correct it unless "the error 'seriously affect[ed] the fairness, integrity or public reputation of [the] judicial proceedings.'" Olano, 507 U.S. at 732 (quoting United States v. Atkinson, 297 U.S. 157 (1936)). Under this last portion of the plain error test, the question is not merely whether the failure to instruct on culpable participation had an effect upon the jury's deliberations and thus enured to Dobson's detriment, but whether such an outcome can be said to have affected the fairness, integrity, or public reputation of the judicial proceedings. Xavier, 2 F.3d at 1287.

We conclude that such a miscarriage has taken place in the present case. We have no means of knowing on what basis the jury convicted Dobson of mail fraud: it could have done so properly on the basis of some direct or circumstantial evidence that Dobson knew and participated in the overall fraudulent UL scheme (e.g., Brothers' testimony), or it could have done so on the basis of the abundant evidence of Dobson's dubious sales presentations that, while no doubt unsavory, are insufficient to support the mail fraud charges alleged in the Indictment. Because a conviction based on an incomplete charge taints the reputation of the judicial process, we will vacate Dobson's conviction and remand the matter for a new trial.[10]

---

the instructions considered in toto, the particular facts of this case, or the jury's verdict negated the "reasonable likelihood" that the jury convicted Dobson on a constitutionally impermissible basis.

[10] The United States emphasizes Brothers' testimony that she told Dobson that SAA was a fraudulent operation. We agree that this can be viewed as evidence of Dobson's knowledge of the overall fraudulent nature of the scheme. On the other hand, there is evidence of Dobson's own fraudulent sales practices. The jury instruction permitted the jury to convict based on a finding of Dobson's isolated misstatements alone. The fact that defense counsel was able to impeach Brothers serves to heighten the possibility that the jury disbelieved her testimony and convicted on an impermissible basis.

15

## III.

As noted above, Dobson has also challenged the sufficiency of the evidence with respect to her conviction for Count Thirty of the Indictment. Although we will reverse Dobson's conviction due to the jury instruction error, we must resolve this issue so that the parties know on which counts they may proceed at retrial.

The evidence at trial showed that, throughout her tenure at UL, Dobson corresponded with UL's home office and otherwise conducted her business through the United States mail and private carriers. Count Thirty references "[a] Federal Express package, shipped from . . . Cordova, TN . . . from Marsha Dobson, Universal Liquidators . . . to Kelly, Universal Liquidators . . . Fort Washington, PA." App. at 115. Dobson argues that because the prosecution introduced no evidence with regard to the contents of this mailing, it presented insufficient evidence to support the conviction on Count Thirty.

We find Dobson's argument unconvincing. The jury was presented with evidence that UL was, through-and-through, a completely fraudulent enterprise. Once the United States shows a fraudulent scheme, the mailing requirement of 18 U.S.C. § 1341 is satisfied by a showing that the defendant used the mail in furtherance of that scheme. Stated otherwise, in order for a particular mailing to support a mail fraud conviction, all that is necessary is that such a mailing have been incidental to a necessary aspect of the scheme or have been "sufficiently closely related to the scheme." United States v. Tiller, 302 F.3d 98, 101-02 (3d Cir. 2002) (internal citations and quotations omitted).[11] And--setting aside for the moment any difficulty

---

[11]Indeed, the Supreme Court has noted that even "'innocent' mailings--ones that contain no false information--may supply the mailing element." Schmuck v. United States, 489 U.S. 705, 715 (1989).

16

created by the jury instruction issue discussed above in Section II--considering the evidence tending to show that UL was entirely fraudulent, combined with the fact that the mailing alleged in Count Thirty was from Dobson qua UL to "Kelly" in her capacity with UL, the jury could have reasonably inferred that the mailing in Count Thirty was sufficiently closely related to UL's fraudulent activities to support a conviction. See generally United States v. Serafini, 233 F.3d 758, 770 (3d Cir. 2000); United States v. Carr, 25 F.3d 1194, 1201 (3d Cir. 1994). We thus reject Dobson's sufficiency of the evidence argument respecting Count Thirty; and, as a result, the United States may again seek a conviction on that charge on remand.

## IV.

For the reasons set forth, we will reverse Dobson's convictions and remand to the District Court for additional proceedings consistent with this opinion.[12]

---

[12] Due to this outcome, we need not address Dobson's arguments with regard to sentencing. Of course, if Dobson is convicted again on remand, the District Court will apply the Sentencing Guidelines and Sentencing Reform Act of 1984 as interpreted in and modified by Booker. See generally United States v. Ordaz, 398 F.3d 236, 238-39 (3d Cir. 2005).

17